# ALFRED ETIENNE OLIVET *vs.* JOHN WHITWORTH AND OTHERS.

*Construction of Powers—Punctuation—Power to Dispose of Property by Will, or Instrument in the Nature of a Will Executed in the Presence of Two Witnesses—Intent of Donor of Power.*

In construing an instrument of writing, the punctuation may be considered, provided the punctuation itself has not created the ambiguity.

When the constituent of a power gives to the donee the right to dispose of property by will, it is not necessary to prescribe the formalities by which the will is to be executed, for the law does that, but when the power is to be executed by "an instrument in the nature of a will," then he should determine the mode of its execution, and such mode must be followed.

A "will" and an "instrument in the nature of a will" are not such equivalent terms as to make the mode prescribed for executing the one necessarily applicable to the other.

The intent of the donor of the power is the great principle which governs in construing the mode in which the power must be executed, and a doubt should, if possible, be solved in favor of the valid execution of the power.

By a deed made in contemplation of marriage, a woman conveyed certain property to a trustee to pay the income to her for life, and after her death to convey and deliver the estate to such persons as she (the grantor) "may by last will and testament, or by instrument in the nature of a will executed in the presence of two witnesses, limit and appoint," and in default thereof to her heirs at law. The woman subsequently became domiciled in Geneva, Switzerland, where she made a holographic will, not executed in the presence of witnesses, and a holographic codicil thereto by which the property held in trust as well as the balance of her estate was bequeathed to her husband in the event of her death without leaving issue. Such holographic will was valid under the Code Napoleon, the law of her domicil. The testatrix died without issue. *Held,* that this will was a valid execution of the power reserved in the deed of trust, since the terms "executed in the presence of two witnesses," were strictly applicable only to an instrument in the nature of a will, and did not require that a will valid according to the general law should also be executed in the presence of two witnesses.

Appeal from the Circuit Court of Baltimore City. In 1873 William Charles Whitworth, an embosser, and his wife both died of typhus fever at the Stockwell Hospital, London, within three weeks of one another. They left surviving them seven young children. One of these, named Sophia Matilda, who had been born two years before in one of the Courts of Drury Lane, was at first placed by an uncle, upon the death of her parents, in a work-house, and was subsequently removed to an orphanage at Hornsby. In 1875, Mrs. Ann Pleasants, a wealthy American lady then residing in Europe, saw the child at the orphan asylum and adopted her with the consent of the child's maternal grandmother, who told her relatives that Sophia was going to live abroad and "would be a lady for life." Mrs. Pleasants called the child Aimée Page Pleasants, and took her to Geneva where she lived. None of the English relatives of Sophia ever heard of her again until after her death and the institution of these proceedings.

Mrs. Pleasants died in 1888, leaving a will by which property amounting to $100,000 was bequeathed to her adopted daughter Aimée, then about sixteen years of age. Mr. Ludovic C. Cleeman, of Philadelphia, the executor and trustee named in Mrs. Pleasants' will, went to Geneva upon a summons from the American Consul, and brought Aimée back to Philadelphia with him. She lived with Mr. Cleeman and with Mrs. Pleasants' sister in Clark County, Virginia, until the autumn of 1891, when Mr. Cleeman sent her to Geneva to spend the winter. There she met and became engaged to Mr. Olivet, an architect. He returned to America with her in the spring of 1892, and they announced to Mr. Cleeman their engagement to be married. He urged Miss Pleasants to execute a deed of trust of all her property before marriage, reminding her of the solemn letter that her adopted mother had left advising her to do that if she married, and telling her "that a request from such a quarter could not be refused." Miss Pleasants refused to execute a deed putting more than half of her

estate beyond her control, and in June, 1892, while on a visit to friends in Baltimore, the deed of trust to the Safe Deposit and Trust Company, referred to in the opinion of the Court, was executed by Miss Pleasants and her fiancé. A few days afterwards they were married in Washington, D. C., and sailed immediately for Europe. They took up their residence at Belle Rive, a suburb of Geneva, and while domiciled there Mrs. Olivet made a holographic will in French of which the following is a translation:

" I, the undersigned, Aimée Olivet Pleasants, make my olographic will as follows: In case I should die without posterity, I name and constitute Mr. Alfred E. Olivet, my husband, my sole legatee of everything. Thus written, dated and signed, the whole by my own hand at Geneva, the 9th day of January, 1893. (Signed), Aimée Olivet Pleasants."

On February 12th, she made a holographic codicil at Nice, by which she bequeathed certain small legacies to friends in America and Geneva and expressed her desire " that all my fortune, as well—that placed in the Safe Deposit and Trust Company, Baltimore, Maryland, U. S. of America, as the rest thereof, be handed over at my death to my husband, Alfred Olivet, my sole legatee."

. The next day she wrote the following letter to her former trustee and guardian—the last that he ever received from her:

" WESTMINSTER HOTEL, NICE, February 13th, 1893.

*Dear Mr. Cleemann :*—I have made a will, a very concise one, in which I name for my universal legatee my husband, and have also placed at the same notary in Geneva, at Mr. Charles Binet (office at 21 Corraterie), a codicile for the legacies I make, in which I mention my wish that there should be no trouble whatever in drawing out the $50,000 out of the Trust Co. in Baltimore and remitting it with the rest of the estate to Mr. Olivet at my death. This will and codicil are to be valid only in the case of my dying childless ; I made this will a codicile in this manner, on my leav-

ing Geneva for Nice, because I was in wretched health at the time, very anemic, and wanted everything to be all right in the event of my death. I expect the birth of a child towards the end of May or beginning of June. Should the child or I both die, according to the will I've made, my husband inherits all except a few legacies. Should I die leaving a child, the will would be worthless, as he would naturally become my heir, by the law. I write you all this so as to ask you if you don't think I've made things all right? Perhaps it is necessary a copy of my will should be over in America? Should I die without having sent a copy to America, will you, nevertheless, see that everything is done according to my wishes as written by my own handwriting an- left in the hands of the notary, Charles Binet, the will on the 9th of January, in Geneva, and on the 12th of February, 1893. The codicil*e* was sent from Nice and duly received. Mr. Binet is the notary, my banker, Mr. Bates, recommended to me. Altho' you are no longer my trustee, dear Mr. Cleeman, you have been so kind, that I can't help thinking you will write and tell me that I must stop being nervous over these things, and that in case anything should happen to me you will see that things go smoothly and prevent Mrs. Randolph or anyone from impeaching the will I've made. Mr. Olivet is so good to me that sometimes I dread lest life with him should be too good to last. We will leave Nice very soon now, so please answer at my address in Geneva. The last battle of flowers took place this afternoon; we watched it from the window, as it would have been rather useless to order a decorated carriage and flowers to throw, etc., unless I could have been certain of my ability to go to it—and to-morrow will be the last of the Carnaval. I suppose you have seen several Carnavals? I hope to come back here some day when I can enjoy the place thoroughly. But I am turning this business letter into one of sentiment and amusement and must stop, as I am feeling tired. Please give my best regards to all at 2135 Spruce; my love to Miss Ellen and tell

her I know she will make allowances for my not writing to her, as I would like to, when she learns I only write necessary letters, as I am not well.

Affectionately yours,

AIMEE OLIVET PLEASANTS.

If you see Miss Page and Miss Bowie, will you kindly remember me to them.   Illness has *prevented me directing this until to-day.*"

On May 29, 1893, Mrs. Olivet was delivered of a still-born child, in her villa at Belle Rive, and a few hours later died.   The Act of Notoriety by which it was established that Mrs. Olivet disposed of her property by last will was as follows (translated:)

" The twenty-first day of June, in the year eighteen hundred and ninety-three.   Before Mr. Charles Louis Ferdinand Cherbuliez and his colleague, Notaries of Geneva, the undersigned, the first acting for Mr. Charles Binet, for the moment prevented from acting, also a notary of Geneva. Appeared,

Mr. Charles Albert Mayer, proprietor, residing at Geneva, Hotel Beaurivage,

and Mr. Franz Paul Borisser, clerk, residing at Geneva, No. 13 Pierre Falto street,

who on their honor and conscience have certified and declared as a fact of public notoriety to all whom it may concern :

That they were perfectly well acquainted with Madame Aimeé Page Pleasants, born Whitworth, daughter of Mr. William Charles Whitworth and Mrs. Matilda Gilbert, and adopted daughter of Mrs. Annie F. Pleasants, wife of Mr. Alfred Etienne Olivet, architect, citizen of Geneva, domiciled at Belle Rive, Commune of Collonge, Canton of Geneva, and that they know that the said Madame Olivet Pleasants died at the said place the 29th day of May, 1893, at half-past eleven o'clock at night, as appears by an extract from the register of deaths of the Commune of Collonge, Belle Rive, signed and delivered the 20th of June, 1893, by Mr.

John Bassell, Director of the Cantonal Bureau of the Etat Civil, which is hereto attached.

" That Madame Olivet Pleasants left an olographic will dated at Geneva, the ninth day of January, 1893, and a codicil, also olographic, dated at Nice (Maritime Alps France), dated the twelfth day of February, 1893, both of which have been deposited among the archives of Mr. Binet, a notary at Geneva, by Act of the 12th day of June, 1893, by virtue of a decree rendered the ninth day of the same month of June by Mr. George Navazza, Judge of the Tribunal of First Instance of Geneva. That by the said will and codicil Madame Olivet Pleasants, in case she should die without posterity, named and instituted her husband, Mr. Alfred Etienne Olivet, her residuary legatee, and made several special legacies. That Madame Olivet Pleasants left no relatives in the ascending line and no descendants whatever, her only child having been born dead on the 29th day of May, 1893, at half-past six o'clock in the evening, as appears from an extract of the Register of Deaths of the Commune of Collonge Belle Rive, signed and delivered the 19th day of June, 1893, by Mr. John Bassel, Director of the Bureau Cantonal of the Etat Civil, and which is hereto annexed.

" Wherefore, Madame Olivet Pleasants became a Genevese citizen by her marriage, having left no heir, having right by law to her property, according to the laws of Geneva, the disposition made by her in favor of her husband comes by right into full execution.

Of which this is the act.

" Done and passed at Geneva in the office, No. 21, Corraterie.

"And after having been read, the witness have signed with the notaries the present minute on file with Mr. Binet. (Signed), Ch. Mayer, F. Boussar, H. Marquemer, notary ; F. Cherbuliez, notary."

Subsequently upon the petition of Olivet reciting the death of his wife and the terms of her will the following order was passed :

" We, the Judge, whose name is subscribed by delegation of the President of the Tribunal of First Instance, having examined the present petition and the papers produced therewith, to-wit :

(*a.*) An Act of Notoriety conducted the 21st day of June, 1893, by Mr. Charles Binet, notary.

(*b.*) An Act of Deposit in the minutes of Mr. Charles Binet, notary, of the olographic will and codicil of Madame Sophia Matilda, the said Aimeé Pleasants, wife of Alfred Etienne Olivet, the said Act of Deposit being dated June 12, 1893.

Agreeably to the Articles 1006 and 1008 of the Civil Code.

We place Mr. Alfred Etienne Olivet as general legatee in possession in everything bequeathed by the said Aimeé Page Pleasants, his wife, by her olographic will of the 9th day of January, 1893, and by her olographic codicil of the 12th day of February, 1893.

Geneva, the 30th day of June, 1893.    (Signed), Ch. Aubent, judge."

Upon the petition of the Safe Deposit and Trust Company the Court below had assumed jurisdiction over the administration of the fund conveyed to it by the above-mentioned deed of trust. The foregoing documents were filed by Olivet in that case, and he asked for a decree directing the payment of the fund to him as the legatee of his wife. An order of publication was issued warning the heirs at law and next of kin of Mrs. Olivet to appear and show cause why the decree asked for by Olivet should not be made. John Whitworth and other brothers and sisters of Mrs. Olivet appeared and claimed the fund under the terms of the deed of trust. A commission to take testimony was issued to London, under which the births, marriages and deaths of the Whitworth family were proved by certificates from the Registrar General Office, Somerset House, London, and by the evidence of members of the family.

Another commission to take testimony was issued to the

United States Consul at Geneva, under which several depo-
sitions were taken.    Among them was the evidence of
MM. Des Gouttes and Demole, both doctors of law and
advocates in the Courts of the Canton of Geneva, who tes-
tified that under Article 970, of the Civil Code Napoleon,
which is in force in Geneva, a holographic will is perfectly
valid, provided it be entirely written, dated and signed by the
hand of the testator, and that witnesses thereto are in no-
wise necessary ; · that under the Code there are three forms
of wills, the holographic, by public act, and the mystic, but
the holographic is the most widely used form—nineteen
out of twenty persons using it ; that after the death of a tes-
tator the validity of a holographic will is established by
being produced before a Judge of the Tribunal of First
Instance for confirmation, according to Article 1007 of the
Code Napoleon.

The Court below (Dennis, J.), decreed that the holo-
graphic will of Mrs. Olivet was not a valid execution of the
power contained in the deed of trust to the Safe Deposit
Co., and that under said deed the trust fund belonged to
the heirs at law and next of kin of Mrs. Olivet, to-wit, two
brothers and two sisters, and the administrator of a de-
ceased brother.    From this decree Olivet appealed.

The cause was argued before Robinson, C. J., Bryan,
McSherry, Fowler, Briscoe, Page and Boyd, JJ.

*Richard M. McSherry* and *Edgar H. Gans*, for the ap-
pellant.

The sole question before the Court is this : Was the
power legally executed by the olographic will ?   Olivet
claims that an olographic will is a good execution of the
power ; the alleged next of kin claim that the power cannot
be executed by any instrument, unless the same be executed
in the presence of two witnesses.    To state the question
more exactly, it is this : Must the will, and any instrument
in the nature of a will, be executed in the presence of two

witnesses, in order to be a good execution of the power?
*Language of Power.*—"To such person or persons as the
said Aimée may by last will and testament, or by instrument
in the nature of a will executed in the presence of two wit-
nesses, limit, nominate and appoint, her coverture notwith-
standing.

1. *Punctuation.*—If we were to construe this sentence
by the punctuation, it would be evident that the expres-
sion "executed in the presence of two witnesses" would
apply to, and qualify, only the phrase "or by instrument
in the nature of a will." By the punctuation we have
two separate and distinct clauses: First—"by last will and
testament." Second—"or by instrument in the nature of a
will executed in the presence of two witnesses." In order
to make the other construction possible, it would be neces-
sary to supply a comma after the expression "nature of a
will," so as to have three separate clauses.

We do not claim that this point is conclusive, for fre-
quently punctuation is negligent; although in this deed it
seems to have been carefully attended to, as an examination
of all its contents will show. What we do claim, however,
is this—our construction accords with the punctuation, and
the construction contended for by the alleged next of kin
does not. To that extent we have a right to claim it as an
argument. *Weatherly* v. *Mister,* 39 Md. 629; *Black* v. *Her-
ring,* 79 Md. 149.

2. *Grammatical Construction.*—By the grammatical con-
struction, our contention is right. We are contending that
the donor of the power intended to give an alternative
method of executing the power. It was to be done either—
*a.* by last will and testament, or *b.* by instrument in the
nature of a will executed in the presence of two witnesses.
When a power is created, the means of executing it are al-
ways introduced by the preposition "*by.*"—The clauses are
separated not only by the disjunctive "or," but by the gov-
erning preposition "by," which distinctly and peculiarily
marks the method of executing the power. This effect of

the repetition of the word "by" is adopted in *Chance on Powers*, section 864, page 314.

3. *Instruments Different.*—It is argued that "a will," and "an instrument in the nature of a will," are practically the same; that they are tautological or equipollent expressions; and that, therefore, any mode of executing the one, should, in reason, be applied to the other. This reasoning is faulty, because the instruments are not the same—A will is a testamentary disposition, *a.* made by one having capacity to will, *b.* and in the form prescribed by law. An instrument in the nature of a will is an instrument which has the same effect as a will, but *a.* may be made by one having no testamentary capacity, *b.* and the form of which is not prescribed by law, but by the person creating the power. Thus, under the English law, a married woman had no right to make a "will," but, in the execution of a power, a married woman had a right to execute an "instrument in the nature of a will."

If the Court should follow the construction contended for by the appellees, they would be obliged to force the expression, "last will and testament," from its ordinary and usual meaning. Though under the old law a married woman could not make a proper will, the instrument being necessarily "an instrument in the nature of a will;" at this time, both in Maryland (the place of the execution of the deed of trust), and in France and Switzerland (the place of the domicil of the testatrix), a married woman can execute a proper will; and in all these places a proper will does not require the signature of the testator "in the presence of two witnesses." These are undoubtedly the general principles of construction which should govern this case, and are strongly supported by the case of *Shearman* v. *Hicks*, 14 Grattan, 96.

4. Why the qualification "*in the presence of two witnesses?*" It may be argued that the qualification, "in the presence of two witnesses," was deemed essential by the donor of the power, and therefore should be applied to both

clauses, because there is no other reason which can be given for its introduction into the deed of trust. This reasoning is not sound; because, 1st. In *Schley* v. *McCeney*, 36 Md. 272, the same words were in the deed creating the power, and yet it was held that the power could be executed by a will made under the statutory forms. 2d. We have a pertinent illustration from Code, Article 93, section 311, copied from the Statute of Frauds, which provides for the methods of making a will. After providing that the original will shall remain in force unless revoked by burning, &c., it proceeds : " Unless the same be altered by some other will or codicil in writing, or other writing of the devisor, signed as hereinbefore said, in the presence of two or more witnesses, declaring the same ; " and yet it has always been held that a will may be revoked in either way, *e. g.:* 1st. by a will executed according to law ; or, 2d. by a writing, signed in the presence of two witnesses. *Ellis* v. *Smith*, 1 Ves. Jr. 11 ; *Chance on Powers*, section 869. This, the Court will perceive, is exactly our contention as to language exactly similar.

The draughtsman in the present case evidently followed our old form applying to married women. It was usual to provide for the execution of a power by will, for the husband might die before the wife, and then she could will, or changes might be made in the law. It was usual also to provide for " instruments in the nature of a will," for, as a rule, married women, under the English law, could not make a will, strictly so called, during coverture ; and the precedents show that this qualification, " in the presence of two witnesses," was usually required in such instrument, as appears in 36 Md. 272, and as appears in Code, Article 93, section 311. This is really the explanation of the whole matter.

5. *Intention.*—It is argued that the intention of the donor of the power was to protect the wife against the influence or fraud of the husband, and for that reason execution in presence of witnesses was required. *a.* " The intent of the

donor of the power is the great principle which governs in
such cases; and we must ascertain that intent from the lan-
guage used in the deed of settlement creating the estate
and confirming the power." *Nevin* v. *Gillespie*, 56 Md. 327.
Courts seldom require any formalities in the execution of
the power beyond those required by the strict letter of the
power." *Schley* v. *McCeney*, 36 Md. 275. *b.* No such in-
tention can be inferred in this case, as the wife was herself
the *donor* and *donee* of the power. There might be some
ground for contending that a deed of trust executed by a
*third person* might be intended to protect the wife against
the husband; but when the wife executes the deed herself
just before her marriage, it seems somewhat absurd to argue
that she intended to provide a protection for her own weak-
ness against her intended husband's influence. *c.* But the
argument of the alleged next of kin must go further. They
must show that the intention was not only to protect the
wife against the husband, but that this protection was pro-
vided for by requiring that any testamentary disposition
must be executed in the *presence of two witnesses*, as the
*only method* of executing the power. Now why should this
be the only method? Suppose Madame Olivet had been
domiciled in Maryland, and had attempted to execute the
power by a will, good under the Maryland statute; accord-
ing to the contention of the other side, this would be an in-
valid execution of the power. And yet the will would be
attested by *two witnesses in the presence of the testatrix.*
Would not an attestation of *two witnesses in the presence of
the testatrix* be as strong a protection to the wife as an exe-
cution by *her in the presence of two witnesses?*

If they concede that a will executed under our present
Maryland formalities would be a good execution of the
power, then they admit that there are alternative modes of
executing the power; and if alternative modes in any case
what right would they have to say that the alternative
form, *e. g.*, " by will" should have special formalities other
than those prescribed by law? *d.* An olographic will is

provided with safeguards. It must be dated, written and signed wholly in the handwriting of the testator and then publicly established before a Court. Madame Olivet being domiciled in Geneva, where the olographic is the common and usual will, "nineteen out of every twenty people use it," the inference is strong, that when the expression " last will and testament" was used, it was intended by her, the donor, to mean such a will as she was accustomed to. Indeed, unless she preserved a copy of the deed of trust and carried it about with her, the only fixed impression she would retain would be that she had the power to dispose of the fund by last will, such as she understood and was familiar with. *e.* The fact that she did execute the power by express reference to the deed of trust by an olographic will, shows beyond all doubt what her intention was as donor of the power. True it is that we are not dealing with what her intention was when she made the will, but with her intention when she made the deed ; but her acts under the deed furnish strong evidence as to what she intended by it. *Topliff* v. *Topliff*, 122 U. S. 131 ; *LeRoy* v. *Beard*, 8 Howard, 466 ; *Black* v. *Herring*, 79 Md. 146 ; *Pearce* v. *VanLear*, 5 Md. 91.

*William S. Thomas* (with whom was *C. Ross Mace* on the brief), for the appellees.

The validity of the execution of a power depends upon the terms of its creation and is independent of the legality in other respects, of the will or other instrument under which the power is sought to be executed. The mode of alienation or appointment operates as a negation of any other mode and is the paramount law governing and controlling every contract in relation to it. *Armstrong* v. *Kerns*, 61 Md. 364, 367 ; *Cook* v. *Husbands*, 11 Md. 492, 503. Equity will aid a detective execution of powers in case of purchasers for value, wives, legitimate children and those to whom the party executing stands in *loco parentis ;* but will not aid a *husband*, illegitimate children, volunteers or the donee.

*Moodie* v. *Reed,* 1 Mad. 516; 2 *Pomeroy Eq.* sc. 834; *Chance on Powers,* sc. 2843; *Farwell on Powers,* (2d ed.), 332.

Puncutation is considered no part of a statute, and LORD KENYON, C. J., in *Doe* v. *Martin,* 4 Term R. 65, said that Courts in construing Acts of Parliament or deeds should read them with such stops as will give effect to the whole. See also *Hammock* v. *Loan & Trust Co.,* 105 U. S. 84, 85. An inspection of the original deed of trust will disclose that the punctuation was not carefully made by the conveyancer. Thus the comma which the appellant claims is inserted in the first paragraph of the power after the word " will," is not inserted at that place; beneath the word " will " and between the line on which " will " is written and the succeeding line appears a pen mark which may or may not have been intended for a comma, and the careless location of this mark in the paper shows the wisdom of Courts in not considering punctuation.

The counsel for the appellant has tried to build an argument on the preposition " by," and have urged that its repetition in the first part of the paragraph, in connection with the conjunction " or," shows an intention to refer to two papers, in the execution of the power. That the conjunction " or " would not have this effect is too plain to require illustration.

As to the preposition " by," some of the best grammarians consider its repetition before words, having equivalent meaning and conected by conjunctions as in the case at bar, is permissible and proper and it is universally held *that had* the second " by " in the clause been omitted, so that the clause had read " by last will and testament or instrument, &c.," in parsing the instrument it would be given the objective case with the preposition " by " *understood* as its object.

The paper evinces an intention to wholly cut off the prospective husband from any part of the fund and secure it to the appellees, for the trust reads " in default of appointment as aforesaid to convey and assign the same to her heirs at

law and next of kin *exclusive of any marital rights*," and though Miss Pleasants may not have known her brothers or sisters, the *disposition* of the fund to them shows the strongest evidence of her feelings.   How then could she reserve the power of disposition by will and at the same time protect herself in the free exercise of her own volition ? The ceremony of witnesses required by the settlement, was introduced for the express purpose *of protecting the wife against the influence of the husband and are matters of substance and not of form*, and without an adherence to those ceremonies the interest of the brothers and sisters cannot be defeated.   The Courts look with especial jealousy to any transaction in which the wife  may have acted under the influence of the husband.   *Breit* v. *Yeaton*, 101 Illinois, 242 ; *Hopkins* v. *Myall*, 2 Russell and Mylnes, 86 ; 2 *Sugden on Powers* (3 Am. from 7 London ed.), p. 86*, 94, sec. 13 ; *Hackrell* v. *Gardiner*, 5 De G. & S. 58 ; *McClintic* v. *Ocheltree*, 4 W. Va. 349 ; *Powell on Powers*, 130, 148, 150 ; *Watt* v. *Watt*, 3 Vezey, 244 ; *Bath* v. *Montague*, 3 Ch. cs. 107-108 ; *Justis* v. *English*, 30 Gratt. 565.

Had Miss Pleasants not intended the direction contained in the power as a protection to her against her husband's duress she would have prescribed no formalities, as she could have directed by any testamentary appointment *without witnesses* to effectively execute the power.   If Mrs. Olivet was acquainted with the laws of Switzerland as is contended, and made the deed of trust with a view to executing an olographic will, why did she think it necessary to require no witnesses in one case and two witnesses in the other, though the execution was to be by instruments of the same nature ?   The best evidence that an olographic will is not considered as being surrounded by sufficient safeguards is that the laws of Maryland permitting testamentary disposition of property in this manner have been repealed, and the law now requires witnesses to a will of personal property.   In Switzerland, no provision is made for the safe custody of olographic will from the time of its execution

until death of the testatrix.   No provision is made for noti-
fying persons as to the time and manner of attacking wills.
The only method of revoking an olographic will is to de-
stroy the old one and make a new one.   The beneficiary
becomes vested with the property without proof that the
"will" was written by the testatrix, and no person can ob-
ject, but must wait until the beneficiary has procured the
estate, then institute a law suit against the beneficiary, and
if the beneficiary has spent or made away with the estate,
he will have the satisfaction of vindicating his rights to his
sorrow, a solecism peculiar to heirs-at-law in Switzerland.
It is not possible that such a paper was contemplated as an
execution of the power, but it is probable that she, knowing
this form of "will" under the law, protected her heirs and
next of kin against such a paper by requiring two witnesses
to the "will," for, in addition to what has already been
written, the power does not read, "Last will and testament
*duly executed according to law,* or by instrument of writing
in the nature of a will executed in the presence of two wit-
nesses," as was the language in *Schley* v. *McCeney* (36
Maryland), in which case it would have been more evident
that two distinct methods were intended, but the word
"*executed*" only appears once, and that after "instrument
of writing in the nature of a will," thus showing that but
one instrument was intended.   *Expressio unius est exclusio
alterius.*

Where power is given to a woman to execute by "will"
and she executes during coverture, it is held, though at com-
mon law a technical will could not be executed by a married
woman, the use of this word when applied to a power is not
given its technical sense, and is synonymous with "instru-
ment in the nature of a will."   *Jenkins* v. *Whitehouse*, 1 Bur-
rows, 431 ; *Barnes* v. *Irvin*, 2 Dallas, 199–202 ; *Sugden on
Powers* (8th Eg. ed.), 230 ; *Longford* v. *Eyre*, 1 Peere Wil-
liams, 740.

*Sugden's Rule.*—Where only one power is given and it
is authorized to be executed by different instruments,

although the ceremonies required to the execution are not stated after each instrument they will relate to both. *Sugden on Powers* (8th ed.), p. 224. This rule is supported by the following cases: *Dormer* v. *Thurland*, 2 Peere Williams, 506, which was a case exactly like the case at bar, the settlement reading: "By his last will or any writing purporting to be his last will, under his hand and seal attested by three or more credible witnesses," and where a will was executed, attested by three witnesses but not sealed, the Court of King's Bench decided the instruments were the same and therefore not an execution of the power. *Ross* v *Ewer*, 3 Atkyns Rep. 150, was where a settlement to married woman read "by her last will and testament in writing, or other writing under her hand and seal, to be attested by two or more credible witnesses, &c." The LORD CHANCELLOR decided the direction of sealing and witnesses, applied to the "will" as well as "other writing," and states: "To reject so material a part of the power, provided as a necessary caution to the deed in order to prevent a disposition by surprise or undue means, is what this Court cannot warrant, therefore I ought not to dispense with these circumstances in the execution of the power."

In *Moodie* v. *Reid*, 7 Taunton Rep. 355, the settlement read: "Should by her last will or any writing or appointment in the nature of a will to be by her signed and published in the presence of and attested by two or more credible witnesses appoint." In England a valid will did not require publication, yet the Court certified that the direction applied to every method designated for the execution of the power. See also to the same effect: *Wade* v. *Padget*, 1 Brown Ch. 364; *Doe* v. *Weller*, 7 Term Rep. 478; *Chance on Powers*, sc. 868.

BOYD, J., delivered the opinion of the Court.

From the record in this case we find that William Charles Whitworth and his wife, Sophia Matilda Whitworth, died in September, 1873, in London, England, leaving surviving

them five children.   The youngest of these, Sophia Matilda, who was about two years of age when her parents died, was taken charge of by an uncle, who shortly after placed her in an orphan asylum in London.   Not long afterwards Mrs. Ann P. Pleasants, an American lady who was traveling abroad, adopted her.   She assumed the name of Aimée Page Pleasants and lived with Mrs. Pleasants until the death of the latter, who left her a very handsome estate by her last will and testament, in which she appointed George H. Fisher and Ludovic C. Cleeman, of Philadelphia, Pa., executors and trustees of her estate and guardian of this child, who was then about sixteen years of age.   Mr. Cleeman brought her to this country where she resided for several years, and then returned to Geneva, Switzerland, where she subsequently engaged herself to be married to Mr. Olivet. They were married in June, 1892, in the city of Washington, D. C.   On the 8th day of that month Miss Pleasants executed, in the city of Baltimore, a deed of trust to the Safe Deposit and Trust Company of Baltimore, with the knowledge and approbation of Mr. Olivet (as was evidenced by his uniting in the instrument), by which she directed fifty thousand dollars of her property, which was still held by Mr. Cleeman, as guardian and trustee under the will ot Mrs. Pleasants, to be paid over and delivered to the Safe Deposit and Trust Company of Baltimore upon her arrival at the age of twenty-one years, and as soon as it was freed from the trust created by the will of Mrs. Pleasants, to be held by said company in trust for her during her life, and, after providing for her receipt of the income from the property so held in trust and for changes of the investments, etc., made the following provision: "And from and after the death of the said Aimée Page Pleasants, to convey, assign and deliver the same to such person or persons as the said Aimée may by last will and testament, or by instrument in the nature of a will executed in the presence of two witnesses, limit, nominate and appoint her coverture, notwithstanding.   And finally, in case she shall die without execut-

ing a will or instrument of writing in the nature of a will as aforesaid, to convey and assign the same to the heirs at law and next of kin of the said Aimeé Page Pleasants, exclusive of any marital rights."

On the 9th day of January, 1893, she made a holographic will at Geneva, by which she made her husband her sole legatee of everything, in case she should die without posterity, and on the 12th day of February, 1893, she made a holographic codicil by which she confirmed her will, and after making pecuniary legacies amounting to twenty-five thousand francs, stated: "I desire that all my fortune, as well—that placed in the Safe Deposit and Trust Company, Baltimore, Maryland, U. S. of America, as the rest thereof, be handed over at my death to my husband, Alfred Olivet, my sole legatee."

It is satisfactorily proven that the will and codicil were made according to the forms required by the laws of the places where they were executed, and therefore under section 319 of Art. 93 of the Code of Public General Laws of this State, they are valid and sufficient to pass the title to her property in the hands of the Safe Deposit and Trust Company of Baltimore—provided the power reserved in the deed of trust above quoted. was legally executed. The question, therefore, to be determined by us is, whether that power required her will to be " executed in the presence of two witnesses"—the appellees, as her next of kin, contending that it did, whilst the appellant claims that this clause only applied to an " instrument in the nature of a will."

In considering this question it is proper to constantly bear in mind the fact that the power of disposition was not given by a third person, but was reserved in the deed of trust by the testatrix herself. Had she not executed the deed, her right to dispose of the property in question by this will and codicil was absolute and free from doubt. The question presented is so narrow that, if punctuation be entirely disregarded, the language used is capable of being interpreted to meet the views of either side. As

was well said in argument, if it be read aloud, different meanings may be given it by the tone of the voice or the accentuation of the several clauses. If the term "or by instrument in the nature of a will" be used parenthetically, then the phrase " executed in the presence of two witnesses," would apply to " last will and testament " as well as to " instrument in the nature of a will," whilst if we pause after reading " last will and testament " and then read " or by instrumeut in the nature of a will executed in the presence of two witnesses," as one unbroken sentence, a proper grammatical construction would confine the limitation to the " instrument in the nature of a will." The expressions used being so nearly poised as to have their meaning thus affected, it is manifestly proper to so construe them as to give effect to the will, rather than to make it nugatory so far as this property is concerned, if that can be done without running counter to their natural meaning, their grammatical construction, or to controlling legal authorities.

That punctuation alone is not necessarily conclusive must be conceded, as it is well known that draughtsmen of legal instruments frequently ignore all the rules on that subject, to which grammarians and rhetoricians attach great importance. The most learned and accomplished lawyers oftentimes pay but little attention to it in their preparation of legal documents. This may be because the copyist or the writer to whom the paper is dictated has not followed the directions or intonations of the author, or it may be because it is known that the cases are few that are determined by punctuation, or for other reasons. But when there is an ambiguity which may be wholly or partially solved by it, provided the punctuation itself has not created the ambiguity, it can be considered (*Weatherly* v. *Mister*, 39 Md. 629 ; *Black* v. *Herring*, 79 Md. 149), but it can never be permitted to overturn what seems the plain meaning of the whole instrument. If we make any use of it in this case, it must inure to the advantage of the appellant. There is in the original deed, which was brought before us by agree-

ment, a comma after " last will and testament," and also after the word " witnesses," so that if we follow the punctuation the phrase " executed in the presence of two witnesses," does not properly apply to " last will and testament." Although punctuation alone is not a safe standard by which to interpret a writing, yet if there be an ambiguity it may shed light on the meaning of the language to be interpreted, and in this case we must ignore it if we adopt the construction contended for on behalf of the appellees. If Miss Pleasants intended to reserve the right to dispose of this property either by a duly executed will, or by some instrument in the nature of a will, provided she executed the latter in the presence of two witnesses, the draughtsmen of the deed of trust used language that was so punctuated as to be capable of that meaning. Therefore, without relying on the position of these commas as at all conclusive, in our search for the intention of the donor of this power, we can at least borrow from them such light as they are permitted under the law to give.

In determining whether the mode of execution prescribed by the deed is applicable to " last will and testament " as well as to an " instrument in the nature of a will," we will first consider those terms for the purpose of ascertaining whether they are synonymous or practically the same. To say that they are of "the same nature," as argued by the appellees, is but to do little more than to repeat the language used in the power, as one is a " will " and the other an instrument " *in the nature of a will.*" But are they such equivalent terms as to make the mode prescribed for executing the one necessailry applicable to the other ? It is true that both are testamentary papers—taking effect only after the death of the maker—and there are undoubtedly cases in which instruments have been called wills and yet have not had testamentary forms. For example, in *Carey* v. *Dennis*, 13 Md. 1, bonds, not intended to constitute any binding obligation on the obligor, or to confer any right on the obligees, or to have any effect until after the death of

the obligor, were held not to be evidences of debt, but in the nature of testamentary papers. The Court quoted from JUSTICE BULLER, in *Habergham* v. *Vincent*, 2 Ves. Jr. 231 ; that "The cases have established that an instrument in any form, whether a deed-poll, or indenture, if the object of this purpose is not to take place till after the death of the person making it, shall operate as a will." But a " will " must be made by one having capacity to make it, and must be executed in one of the modes fixed by law, and many papers that were prior to 1884 held in this State to be wills for the purpose of passing personal property, would not now be valid, as the Act of the Assembly passed in that year required all wills executed in this State to be attested and subscribed in the presence of the testator by two or more credible witnesses. Whilst an " instrument in the nature of a will," if executed in pursuance of a valid power, may be made by one not having testamentary capacity and in a different form from that prescribed by the laws governing the execution of wills, and yet have the effect of a will. The two instruments may accomplish the same result, but may not be in the same form. It is the *mode of execution* and not the *effect* of these instruments we are now considering.

In *Schley* v. *McCeney*, 36 Md. 275, JUDGE ALVEY quoted from *Chance on Powers*, where it is said : " Where a party directs a power to be executed by 'will' simply, it may be a reasonable presumption that he means such a will as would be requisite to dispose of the like species of property ; but when he prescribes certain formalties, the presumption ceases ; it seems fair then to conclude that all which he means, is a testamentary act, attended with the formalities prescribed by himself." In that case the distinction was clearly recognized when the Court said : " Here there are two modes prescribed, the one to be by will duly executed according to law, which fairly means the general law, regulating the execution of wills, the disability of coverture of the donee being in this respect dispensed with ; the other

by a testamentary paper in the nature of a will, to be exe-
cuted in the presence of two witnesses, without anything
more." In *Southby* v. *Stonehouse*, 2 Ves. Sr. 610, LORD
CHANCELLOR HARDWICKE said that a writing in the nature of
a will, by a *feme covert*, in virtue of the power reserved to
her, in two deeds of settlement, was not a proper will, al-
though it had the effect of a will to three intents; the words
have the same liberal construction, it is ambulatory until
the testator's death whom appointee must survive, and can
only take effect from the testator's death. See also 2 *Perry
on Trusts*, sec. 511 *b*.

When a donor gives the donee power to dispose of prop-
erty by will, there is no necessity to prescribe the cere-
monies and formalities by which it is to be executed, for the
law has already done that, but when the power is to be
exercised by an "instrument in the nature of a will," then
he should determine the mode of its execution, and having
done so, it must be complied with.

In this case if the grantor had only reserved the power
of disposing of this property by her "last will and testa-
ment," the formalities by which that could be done were
settled by law. If she had then executed her will in this
State it was required to be attested and subscribed in her
presence by two or more credible witnesses, or else, in the
language of the statute, "be utterly void and of none effect."
Or she could, under section 319 of Art. 93 of our Code,
execute it out of the State "according to the forms required
by the law of the place where the same was made, or by
the law of the place where such person was residing when
the same was made." But in order to dispose of the prop-
erty by some instrument that was to take effect after her
death, though not technically a will, if she saw proper to
do so she reserved the additional power of disposition by
"an instrument in the nature of a will."

There is, then, a manifest distinction between a "will" and
an "instrument in the nature of a will," especially as to the
manner in which they may be executed, although the latter

may operate as a will, and to avoid an attempted execution
of a power being declared invalid, by reason of a defective
execution of a will, it may be a wise precaution for the
donor, who desires to give the donee power of disposition
of the property, to take effect at the latter's death, to sup-
plement the power of disposition by "will" by "an instru-
ment in the nature of a will." It is perfectly certain that
the two instruments are not *necessarily* the same, and there-
fore it does not follow that because Miss Pleasants fixed the
mode of execution of an "instrument in the nature of a
will," her "will" should necessarily be executed in the same
way. Hence, we do not think our interpretation of this deed
can be aided by the contention of the appellee on that ques-
tion, or that such contention can be maintained.

So when we come to determine whether the expression
"executed in the presence of two witnesses" is applicable
to both, we are met with the fact that the punctuation, so
far as it can be considered, points to the contrary, and the
further fact that it is *at least usual* for the one instrument
to be executed in the manner prescribed by law, and the
other as determined by the creator of the power. If it be
said that the donor has prescribed the method by which her
"will" should be executed, if that instrument be adopted,
and that if that be followed nothing more is required, then
such an instrument would not be a technical will if executed
in Maryland, because our statute requires it to be attested
and subscribed in the presence of the testator and does not
require it to be executed in the presence of witnesses. If
it be conceded that a will executed in accordance with the
requirements of the present Maryland laws applicable to
wills made in this State, would be a good execution of the
power, then it must be admitted that there are alternative
modes of executing the power provided for in the deed. It
is true that both might be done, but if the contention of the
appellees be correct, it must follow that Miss Pleasants under-
took to say how a "will" should be executed. But when
we remember she was reserving to herself certain powers,·

and especially when we see from the evidence that she was not twenty-one years of age, it is difficult to convince ourselves that she intended or desired to say she could not dispose of this property by a will executed as prescribed by law, and that there must be superadded to those requirements a provision that she must execute it in the presence of two witnesses. We can very safely assume, we think, that she was satisfied to let the law determine how her will should be executed. Unless there be some intention manifested to the contrary on the face of the instrument, we deem it to be much more in accord with justice and the wishes of the party reserving a power of this kind, to construe it liberally in her favor, as far as it can be done consistently with the authorities and binding decisions on the subject. The policy of our law has undergone marked changes in favor of married women, and the reason for surrounding their acts with " the fettering and circumscribing powers of this kind," as given by some of the early cases, do not apply with equal force at this day. As was well said by JUDGE TUCK in *Cooke* v. *Husbands*, 11 Md. 505, " It cannot be maintained as a general proposition, universally true, that these settlements are intended to protect the wife's weakness against her husband's power and her maintenance against his dissipation    *    *    *    for many of them are made where the utmost confidence is reposed in the husband    *    *    *    *    *    We are not to assume that husbands will be constantly endeavoring to wrest their wives's property from them and devote it to their own uses." It is unfortunately true that money and wealth are too often the moving causes that lead to matrimonial alliances, but Courts should not assume or be too ready to believe that a deed of this kind, prefaced by the statement that " whereas a marriage is about to be solemnized between the parties hereto of the first and second parts " ( Miss Pleasants and Mr. Olivet), was intended by ·them or either of them to indicate any want of confidence in the one by the other.

· But in 1 *Sugden on Powers*, 224, 8th edition (271 of 7th

ed.), that learned author states this rule : "But where only one power is given, and it is authorized to be executed by different instruments, although the ceremonies required to execute it are not stated after each instrument, they will relate to both."　The principal case relied on for that statement is *Dormer* v. *Thurland*, 2 P. Wms. 506.　There a power was given to A., if he should die before his wife without issue, to be executed " by his last will, or any writing purporting to be his last will, under his hand and seal, attested by three or more credible witnesses."　A. executed his will according to the Statute of Frauds, but it was not sealed.　LORD CHANCELLOR KING held that it was a good exercise of the power, but the Judges of the King's Bench decided that it ought to have been sealed, but filed no opinion.　The punctuation differs in that case from the one now before us and the phrase "or any writing purporting to be his last will," as punctuated is inserted parenthetically.　In *Earl of Darlington* v. *Pulteney*, Cowper, 266, LORD MANSFIELD said that the case of *Dormer* v. *Thurland* goes a great way, and that "LORD KING was of opinion that it was a good execution of the power, because by will, and I own I should incline to that opinion."　The case of *Ross* v. *Ewer*, 3 Atk 156, is also relied on by Mr. Sugden.　In that case stock belonging to the wife was, by settlement before marriage, vested in trustees who were to transfer one " moiety unto such person or persons, and to and for such uses, intents and purposes, and in such manner as the said Ann should, in and by her last will and testament, in writing or other writing, under her hand and seal, to be attested by two or more credible witnesses."　LORD HARDWICKE held that the words " under her hand and seal to be attested by two or more credible witnesses," were referable to the will as well as to the other writing.　He admitted that the words might be construed in another sense, but thought they would be then much more strained than by his interpretation of them.　His reasoning is not satisfactory and he incorrectly stated, in referring to *Dormer* v *Thurland*, that LORD CHANCELLOR

KING held that the seal to a will in that case could not be dispensed with. The report of the case shows that LORD KING held otherwise, although he was afterwards reversed by the Court of King's Bench. But this case, as well as the general rule stated by Mr. Sugden, undoubtedly goes further than is consistent with other authorities and beyond the contention of the appellees in this case, for the words, " other writing," in *Ross* v. *Ewer*, and " different instrument" in Sugden, are broad enough to include acts *inter vivos*, as well as wills and other testamentary papers. In *Doe* v. *Morgan*, 7 Term Rep. 103, where the power was to appoint " by deed, or will, signed in the presence of three witnesses," CHIEF JUSTICE KENYON thought an appointment by deed would have been good, though not executed in the presence of three witnesses. In *Moreton* v. *Lees*, cited by Mr. Sugden, the power was " by any deed or deeds, writing or writings, to be by him duly signed, sealed and executed, or by his last will and testament in writing, to be by him signed, sealed, published and declared in the presence of three or more credible witnesses," and it was held that an execution by deed was valid although not attested by three witnesses. Other cases might be cited, but it was conceded by the appellees and held by the Court below, that the rule should be restricted in its application to instruments of the same nature. In 1 *Chance on Powers*, 311, it is said, " It is impossible to lay down any general rule on the point ; it is a mere question of construction, and every case of doubt must very much depend on its own circumstances, as the nature of the property and of the instrument and the usage in like cases, etc. Sir E. Sugden's rule * * * * * * * (being the one above quoted), cannot be considered acurate."

It is undoubtedly true that to follow or be governed by an arbitrary rule of that character would in a great measure interfere with the proper construction of such instruments by the Courts while it is their duty to endeavor to ascertain the intent of the donor and the meaning of the lan-

guage used.  " The intent of the donor of the power is the great principle which governs in such cases,  *  *  and we must ascertain that intent from the language used in the deed of settlement creating the estate and confirming the power."  *Nevin* v. *Gillespie*, 56 Md. 327.

The only American case that has been cited in argument on this ·question is that of *Shearman* v. *Hicks*, 14 Grattan, 96.  The power under consideration in that case is not exactly in the same language as the one before us, and without adopting it we prefer to base our decision on the reasons herein given by us.

Although the case of *Schley* v. *McCeney*, *supra*, cannot be said to be exactly in point, yet it shows the tendency to construe such powers liberally, so as to sustain their execution.  The power was to a married woman, and although her will was not executed with all the formalities required at that time of those laboring under the disability of coverture, yet the Court construed the power " by will duly executed according to the mode now prescribed for the execution of wills, or in the mode which may be prescribed at the time of the execution of her will," to mean duly executed according to the general laws regulating the execution of wills, the disability of the coverture of the donee being dispensed with.  JUDGE ALVEY quoted from *4th Kent's Com.* 331, that " when there are several modes of executing a power, and no directions are given, the donee may select his mode, and the Courts seldom require any formalities in the execution of the power, *beyond those required by the strict letter of the power.*"

When a party has executed a deed of this character and has reserved a power such as that before us, to be exercised by a " will" or an " instrument in the nature of a will," we think it should be construed to mean a will executed in accordance with law, unless there be other formalities prescribed in unambiguous language.  Under the existing laws of this State, as well as those of her residence, Mrs. Olivet's coverture did not prohibit or interfere with her making a

will as she could have done if she had been a *feme sole.* If any further protection or safeguards be needed or desired, other than what the law prescribes, let them be unequivocally expressed. That is a safer rule than the one adopted by Mr. Sugden. Whatever doubt there may exist as to the interpretation of such powers should, under such circumstances as those in this case, be solved in favor of a valid execution of the power, when possible. In *Cooke* v. *Husbands, supra,* it was said, in speaking of a *feme covert,* when her powers were not such as they are now, "If the parties making the settlement intend to tie up the property in the wife's hands, they may use apt and proper limitations. * * Therefore a *feme covert* may act in reference to her separate estate as a *feme sole* when the settlement contains no limitations on the subject, on the principle that the *jus disponendi* accompanies the property, unless restrained in terms, or by the manifest intention of the instrument."

Without deeming it necessary to discuss the authorities cited on the question, or to decide how far the subsequent acts of Mrs. Olivet in making her will, etc., can be properly considered in our effort to ascertain her intention when she made the deed, it is gratifying to us to find from the record that our construction of this instrument is in accord with what she evidently thought it meant. If she had intended to restrict her right to dispose of the property by will to one executed in the presence of two witnesses, it is not reasonable to suppose she would have forgotten that important provision in so short a time, or that she would have so carefully placed this will and codicil in the custody of the notary for safe keeping. There is not the slightest intimation that her husband exerted his powers or attempted in any way to influence her in the step she took. Making a codicil by which she deprived him of part, although a small part, of her estate, which would have gone to him under her will, indicates that she was untrammelled by any improper influence, and was left to her own volition. Her disposition of her property, with the exception of the few

legacies to others, to her husband, to whom she was devotedly attached, was more to be expected than to leave it to her brothers and sisters from whom she had been separated since she was three years of age.

The punctuation, the language employed in the deed, its grammatical construction, the circumstances under which it was executed, the subsequent acts of Mrs. Olivet, and the reasonableness of her conduct all tend to show that her intention was to prescribe two modes of executing the power reserved; the one to be by such a will as would be requisite to dispose of this property and the other by an instrument in the nature of a will to be executed in the presence of two witnesses.

It follows from what we have said that the holographic will, including the codicil of Mrs. Olivet, was a valid execution of the power contained in the deed of trust, and that the decree of the Court below must be reversed.

> *Decree reversed and cause remanded.*
> *The costs to be paid out of the trust*
> *fund.*

(Decided January 9th, 1896.)